WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth (DW-9618)
dwollmuth@wmd-law.com
Frederick R. Kessler (FK-8168)
fkessler@wmd-law.com
One Gateway Center
Newark, NJ 07102
(973) 733-9200

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY FOX, Derivatively on Behalf of BLACKROCK EQUITY DIVIDEND FUND, | ) ) ) Case No. |
| | ) |
| Plaintiff, | ) VERIFIED SHAREHOLDER ) DERIVATIVE COMPLAINT ) |
| | ) |
| v. | ) ) |
| BLACKROCK ADVISORS, LLC, | ) ) |
| Defendant, | ) ) |
| -and- | ) ) |
| BLACKROCK EQUITY DIVIDEND FUND, | ) ) ) |
| Nominal Defendant. | ) ) DEMAND FOR JURY TRIAL ) |

Plaintiff Amy Fox, located at 3917 Canning Avenue, San Diego, California, 92111, by her attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a derivative action brought by plaintiff on behalf of BlackRock Equity Dividend Fund ("Equity Dividend Fund") against defendant BlackRock Advisors, LLC ("BRA") pursuant to section 36(b) of the Investment Company Act of 1940 ("ICA"), as amended 15

U.S.C. §80a-35(b) ("Section 36(b)").

2.      Defendant BRA is the Equity Dividend Fund's investment manager/adviser, for which it charges the Equity Dividend Fund fees.  These fees, however, are improper and excessive.  To start, defendant BRA delegates almost all of its investment management duties to its sub-adviser BlackRock Investment Management, LLC ("BIM").  Despite this fact, defendant BRA retains a substantial portion in fees that it charges the Equity Dividend Fund.  For example, in fiscal year 2013, the Equity Dividend Fund paid defendant BRA over *$144 million* in investment management fees.  Of that sum, defendant BRA paid BIM just $106.5 million, retaining over *$37.6 million* for itself, despite doing little, if any, work.  Indeed, the additional administrative and supervisory services provided by defendant BRA are minimal and the Equity Dividend Fund pays for many of these additional services through separate agreements and/or fees.

3.      Next, defendant BRA's fee schedule is not designed for the Equity Dividend Fund and its shareholders to take advantage of the savings arising from economies of scale.  An accepted precept in the mutual fund industry is that it is not harder to manage a fund simply because it is bigger.  Therefore, in order to prevent outsized fees, the percentage of assets under management that advisers charge as fees must decrease as the assets grow.  Defendant BRA has not followed this rule.  Despite the Equity Dividend Fund's net assets growing by nearly $7 billion and resulting in an additional $34.3 million in advisory fees for defendant BRA during the 2013 fiscal year, less than $500,000 in savings were passed on to the Equity Dividend Fund.

4.      Defendant BRA's fees are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.  Accordingly, pursuant to Section 36(b)(3), plaintiff seeks, on behalf of the Equity

Dividend Fund, the damages resulting from the breaches of fiduciary duties by defendant BRA, including the amount of excessive compensation and payments received by defendant BRA and the rescission of the contracts that form the basis for the excessive and illegal fees.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. §80a-43, 15 U.S.C. §80a-35(b)(5), and 28 U.S.C. §1331.

6.    Venue is proper in this judicial district pursuant to section 44 of the ICA, 15 U.S.C. §80a-43, and 28 U.S.C. §1391 because defendant BRA is an inhabitant of this district, maintains offices in this district, and/or transacts business in this district, and because certain of the acts and transactions giving rise to plaintiff's claim occurred in this district.

## PARTIES

**Plaintiff**

7.    Plaintiff Amy Fox owns shares in the Equity Dividend Fund.

**Nominal Defendant**

8.    Nominal Defendant Equity Dividend Fund invests primarily in a diversified portfolio of equity securities, investing its assets in equity securities and dividend paying securities.  As of March 18, 2014, the Equity Dividend Fund had net assets of $30.3 billion.  The Equity Dividend Fund's principal executive offices are located at 100 Bellevue Parkway, Wilmington, Delaware.

**Defendant**

9.    Defendant BRA is an investment advisor that serves registered companies under the ICA.  Defendant BRA serves as the investment adviser for the Equity Dividend Fund. Defendant BRA is a Delaware limited liability company with an office located at 1 University

Square Drive, Princeton, New Jersey.

## BACKGROUND INFORMATION ABOUT THE INVESTMENT MANAGEMENT INDUSTRY AND THE PURPOSE OF SECTION 36(b)

10.     A mutual fund is typically created and managed by a pre-existing organization known as an investment adviser that generally supervises the daily operation of the fund and often selects affiliated persons to serve on the fund's board of trustees.  Congress recognized as early as 1935 that because a typical mutual fund is organized by its investment adviser which provides it with almost all of its management services, and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the adviser.

11.     Because of this relationship in the mutual fund industry, there is no arm's-length bargaining.  As a result, in 1940, Congress enacted the ICA to protect mutual funds and their shareholders from unscrupulous investment advisers.  The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated, [and] managed, … in the interest of … investment advisers, … rather than in the interest of [shareholders]."  As stated in the ICA:

> [T]he *national public interest and the interest of investors are adversely affected … when investment companies are organized, operated, [and] managed … in the interest of … investment adviser, … rather than in the interest of [shareholders]* … [or] when investment companies … are not subjected to adequate independent scrutiny.

ICA section 1(b)(2), (5); 15 U.S.C. §80a-1(b).

12.     During the 1960s, Congress realized that investment advisers to equity mutual funds were charging those funds excessive fees.  Thus, Congress added Section 36(b) to the ICA in 1970.  This provision created a federal cause of action for breach of fiduciary duty by investment advisers.  Section 36(b) states in pertinent part:

[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. ***An action may be brought under this subsection ... by a security holder of such registered investment company on behalf of such company, against such investment adviser, or an affiliated person of such investment advisor ... for breach of fiduciary duty in respect of such compensation*** or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

## DEFENDANT BRA CHARGES THE EQUITY DIVIDEND FUND EXCESSIVE FEES

13.     The test for determining whether fee compensation paid to defendant BRA violates Section 36(b) is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in light of all the surrounding circumstances. Thus, an adviser violates Section 36(b) if it charges a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

14.     As further detailed herein, the investment management fees defendant BRA charged the Equity Dividend Fund were so excessive that they were in breach of defendant BRA's Section 36(b) fiduciary duty to the Equity Dividend Fund.  The excessiveness of the fees are demonstrated by, inter alia: (i) the nature and quality of services provided to the Equity Dividend Fund and its shareholders in exchange for the investment management fees; (ii) the failure of defendant BRA to adequately pass economies-of-scale savings on to the Equity Dividend Fund and its shareholders, and the retention of those economies-of-scale savings by defendant BRA; (iii) the costs and profitability of defendant BRA's investment management services; and (iv) the failure of the Board of Trustees (the "Board") to exercise the requisite level of care and conscientiousness in approving the fees paid pursuant to the Investment Management Agreement ("IMA") between defendant BRA and the Equity Dividend Fund.

**The Nature and Quality of the Investment Management Services Performed by Defendant BRA Do Not Justify Defendant BRA's Fee**

15.     The IMA tasks defendant BRA with managing the investment and reinvestment of the Equity Dividend Fund's assets.  Defendant BRA's IMA with the Equity Dividend Fund states that defendant BRA must fulfill the following general responsibilities: (i) "act as investment advisor for and supervise and manage the investment and reinvestment of the [Equity Dividend Fund's] assets"; (ii) "arrange … for the purchase and sale of securities and other assets held in the investment portfolio of the [Equity Dividend Fund]"; (iii) "provide investment research to the [Equity Dividend Fund]"; (iv) "supervise continuously the investment program of the [Equity Dividend Fund] and the composition of its investment portfolio"; and (v) maintain books and records relating to the Equity Dividend Fund's  investment advisory services.

16.     Rather than providing the majority of the investment management services directly to the Equity Dividend Fund, defendant BRA subcontracts with others to provide the services at a fraction of the fee charged to the Equity Dividend Fund.  In particular, defendant BRA subcontracts its investment management duties to BIM pursuant to a Sub-Advisory Agreement.  BIM's Sub-Advisory Agreement with the Equity Dividend Fund requires BIM to fulfill the below general responsibilities, which are practically identical to the responsibilities outlined above in defendant BRA's IMA with the Equity Dividend Fund.  In particular, BIM's Sub-Advisory Agreement with the Equity Dividend Fund requires BIM to: (i) "[act] as investment advisor for and manag[e] the investment and reinvestment of those assets of the [Equity Dividend Fund]"; (ii) arrange "for the purchase and sale of securities and other assets of the [Equity Dividend Fund]"; (iii) "[provide] investment research and credit analysis concerning the [Equity Dividend Fund's] investments"; (iv) "[place] orders for all purchases and sales of such investments made for the [Equity Dividend Fund]"; and (v) maintain books and records

relating to its provision of investment advisory services.   The following chart comparing defendant BRA's and BIM's duties demonstrates how defendant BRA delegates almost all of its investment management duties to BIM:

| Comparison of Manager and Sub-Adviser Responsibilities | |
| --- | --- |
| BRA | BIM |
| Duties and Obligations of the Advisor with Respect to Investment of Assets of the Fund. Subject to the succeeding provisions of this section and subject to the direction and control of the Fund's Board of Directors, the Advisor shall (i) act as investment advisor for and supervise and manage the investment and reinvestment of the Fund's assets and in connection therewith have complete discretion in purchasing and selling securities and other assets for the Fund and in voting, exercising consents and exercising all other rights appertaining to such securities and other assets on behalf of the Fund; (ii) supervise continuously the investment program of the Fund and the composition of its investment portfolio; (iii) arrange, subject to the provisions of paragraph 4 hereof, for the purchase and sale of securities and other assets held in the investment portfolio of the Fund; and (iv) provide investment research to the Fund. | Services of the Sub-Advisor. Subject to the succeeding provisions of this section, the oversight and supervision of the Advisor and the direction and control of the Fund's board of trustees (the "Board of Trustees" or "Trustees"), the Sub-Advisor will perform certain of the day-to-day operations of the Fund, which may include one or more of the following services, at the request of the Advisor: (a) acting as investment advisor for and managing the investment and reinvestment of those assets of the Fund as the Advisor may from time to time request and in connection therewith have complete discretion in purchasing and selling such securities and other assets for the Fund and in voting, exercising consents and exercising all other rights appertaining to such securities and other assets on behalf of the Fund; (b) arranging, subject to the provisions of paragraph 3 hereof, for the purchase and sale of securities and other assets of the Fund; (c) providing investment research and credit analysis concerning the Fund's investments, (d) assist the Advisor in determining what portion of the Fund's assets will be invested in cash, cash equivalents and money market instruments, (e) placing orders for all purchases and sales of such investments made for the Fund, and (f) maintaining the books and records as are required to support Fund investment operations. |

17.   In addition to limiting defendant BRA's duties to general oversight and supervising BIM, the IMA limits defendant BRA's exposure to liability.   In particular, defendant BRA is not liable for any investment decision made by a sub-adviser.   Defendant BRA's IMA

with the Equity Dividend Fund contains the following language regarding defendant BRA's liability exposure:

> Limitation of Liability. ***Adviser shall not be liable for any error of judgment or mistake of law or for any loss suffered by the Fund in connection with the performance of this Agreement***, except a loss resulting from a breach of fiduciary duty with respect to the receipt of compensation for services or a loss resulting from willful misfeasance, bad faith or gross negligence on its part in the performance of its duties or from reckless disregard by it of its obligations or duties under this Agreement.

18.     Defendant BRA shares its supervisory role with the Board, which further limits defendant BRA's responsibilities.  According to the Statement of Additional Information for the Equity Dividend Fund, the Board is responsible for overseeing the Equity Dividend Fund's activities, monitoring the quality of services provided to the Equity Dividend Fund, and reviewing the Equity Dividend Fund's investment performance.

19.     Defendant BRA subcontracting its investment management duties to sub-advisers has no effect on the management fees it charges the Equity Dividend Fund.  Rather, the management fees are based on a stated percentage of the Equity Dividend Fund's average daily net asset value.  As such, the investment management fees are not based on the services actually rendered or defendant BRA's costs in providing services to the Equity Dividend Fund.  For certain funds, defendant BRA has agreed to waive a portion of its advisory fees, resulting in slightly lower effective rates for those funds.  However, these waivers are just designed to create the illusion of savings for fund holders.  Defendant BRA has only agreed to fee waivers for select funds and, where they exist, the fee reductions are minimal.  The funds that receive fee waivers still pay fees that are drastically out of proportion to the services provided by defendant BRA.  The Equity Dividend Fund paid defendant BRA ***$144.2 million*** in advisory fees for the 2013 fiscal year, over $37.6 million of which went to defendant BRA for doing almost no work. In the 2013 fiscal year, defendant BRA waived just $714,318 in fees, less than 1% of the total

fees defendant BRA charged the Equity Dividend Fund.  Defendant BRA's effective fee schedule

with the Equity Dividend Fund including waivers is as follows:

| Fund | Stated Advisory  Fee | Investment Advisory Fees (most recent fiscal year) |
| --- | --- | --- |
| Equity Dividend Fund | Tiered: 0.48% to 0.60% | $144.2 million |

20.     In exchange for its services, defendant BRA in turn pays fees to BIM.  While the

Equity Dividend Fund paid defendant BRA over *$144 million* in advisory fees for the 2013

fiscal year, BIM was paid just *$106.5 million* for its sub-advisory services.  In 2013, defendant

BRA retained over *$37.6 million* of the fees paid to it by the Equity Dividend Fund despite

delegating almost all of its duties to BIM.  The retained fees represented over *35%* of the fees

paid to the sub-advisers for actually managing the Equity Dividend Fund's portfolios.   The

following table reflects the material difference in the fees defendant BRA charged the Equity

Dividend Fund, and the fees defendant BRA paid BIM for substantially the same service in

2013:

| Fund | Net Paid to BRA | Net Paid to BIM | Fees Retained by BRA | BRA's Fees as a Percentage of Subadviser's Fees |
| --- | --- | --- | --- | --- |
| Equity Dividend Fund | $144,192,714 | $106,562,386 | $37,630,328 | 35% |

21.     The higher fees paid by the Equity Dividend Fund are not justified by any

additional services provided to the Equity Dividend Fund by defendant BRA.  In addition to the

investment advisory services discussed above, the IMA purportedly requires certain

administrative services to be provided to the Equity Dividend Fund.  These administrative

services include overseeing the daily pricing of the Equity Dividend Fund's portfolio securities,

overseeing the maintenance of certain books and records by the Equity Dividend Fund's other

service providers, overseeing the preparation and filing of the Equity Dividend Fund's tax

returns, preparing financial information for the Equity Dividend Fund's shareholder reports and other required U.S. Securities and Exchange Commission ("SEC") filings, and responding to shareholder inquiries about the Equity Dividend Fund or referring those inquiries to the Equity Dividend Fund's other service providers.  According to publicly disclosed administrative services agreements for other mutual funds, all of these administrative services covered by the IMA are *de minimus* and can be obtained from unaffiliated service providers through arm's-length negotiations for less than five basis points.[1]

22.     Indeed, the Equity Dividend Fund has a separate agreement with State Street Bank and Trust ("State Street") that requires State Street to provide many of the same administrative services, including accounting services that are purportedly provided under the IMA, and requires these funds to pay a separate fee to State Street for those services.  As shown in the following chart, the Equity Dividend Fund paid State Street nearly $5.5 million during its three most recently reported fiscal years for purported "accounting services":

| Accounting Services Fees Paid to State Street | |
|---|---|
| 2011 | $1,189,071 |
| 2012 | $1,973,529 |
| 2013 | $2,331,939 |
| **Total** | **$5,494,539** |

23.     Further, defendant BRA receives additional compensation, separate and apart from the fees paid by the Equity Dividend Fund under the IMA, for certain of the administrative services purportedly provided under the IMA.  For example, as shown in the following chart, the Equity Dividend Fund paid defendant BRA $594,939 during its three most recently reported fiscal years for purported "accounting services":

---

[1] A basis point is a unit of measure used in finance to describe the percentage change in the value or rate of a financial instrument.  One basis point is equivalent to 0.01% (1/100th of a percent).

| Accounting Services Fees Paid to BRA | |
|---|---|
| 2011 | $145,190 |
| 2012 | $170,944 |
| 2013 | $278,805 |
| **Total** | **$594,939** |

These fees for accounting services are in addition to the amounts the Equity Dividend Fund paid under the IMA purportedly for having defendant BRA prepare its tax returns and required filings.

24.     In addition, as shown in the following chart, the Equity Dividend Fund paid defendant BRA $745,486 during its three most recently reported fiscal years for "maintain[ing] a call center, which is responsible for providing certain shareholder services to the Funds, such as responding to shareholder inquiries...." This call center fee is in addition to the amount the Equity Dividend Fund paid under its respective IMA purportedly for responding to shareholder inquiries or referring those inquiries to the Equity Dividend Fund's other service providers. In particular, the Equity Dividend Fund paid defendant BRA the following amounts between 2011 and 2013 for maintaining a call center:

| Investor Service Center Fees Paid to BRA | |
|---|---|
| 2011 | $177,268 |
| 2012 | $197,584 |
| 2013 | $370,634 |
| **Total** | **$745,486** |

25.     Accordingly, despite the fact that BIM manages 100% of the Equity Dividend Fund's assets, BIM charges defendant BRA only 73% of the total fees that defendant BRA charges the Equity Dividend Fund. Although the IMA tasks defendant BRA with the responsibility of assigning, overseeing, and evaluating the assets managed by the sub-advisers, these responsibilities are minimal compared to the day-to-day responsibilities of managing the

Equity Dividend Fund's portfolio, and are worth even less when taking into account defendant BRA's limitation of liability for BIM's actions, defendant BRA sharing its supervisory role with the Board, and defendant BRA sharing its administrative duties with unaffiliated service providers.

**Economies of Scale Enjoyed in Connection with the Investment Management Services Were Not Passed on to the Equity Dividend Fund as Required by Section 36(b)**

26.     The legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is one of the principal causes of excessive fees. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. The work required to operate a mutual fund does not increase proportionately with the assets under management. Investment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $100 million nearly as easily as $1 billion, and $1 billion nearly as easily as $10 billion. Economies of scale should lead to lower fees as assets under management increase.

27.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office. Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.

28.     Mutual fund structures often use "breakpoints" – the point at which a fee rate decreases when net assets increase – to pass on to shareholders the benefits realized from such economies of scale. Defendant BRA's breakpoints did not give the Equity Dividend Fund and its shareholders meaningful benefits from the economies of scale enjoyed by the Equity Dividend Fund. In particular, defendant BRA's fee schedule sets the initial break points too high, spaces

them too far apart, and reduces the fee by too small an amount to give the Equity Dividend Fund and its shareholders any meaningful benefit of the economies of scale.

29.     As demonstrated by the fee schedule below, very large increases in the Equity Dividend Fund's assets under management result in very small decreases in its investment advisory fee rate.  The Equity Dividend Fund, a fund with $30.3 billion in net assets, does not have its first breakpoint take effect until $8 billion in assets under management, and that breakpoint reduces the fee rate on assets under management over $8 billion by only four basis points, from 0.60% to 0.56%.  Subsequent breakpoints take effect at intervals of $2 billion up to $12 billion in assets under management, with each breakpoint reducing the fee rate by two or four basis points, to 0.56% on assets under management from $8 billion to $10 billion, and 0.54% on assets under management from $10 billion to $12 billion.  The investment advisory fee schedule includes another breakpoint at $17 billion, which again reduces the fee rate by two basis points, from 0.54% to 0.52%, on assets under management from $12 billion to $17 billion. Thereafter, breakpoints take effect at intervals of $8 billion to $15 billion in assets under management, with each breakpoint reducing the fee rate by one basis point, to 0.51% on assets under management from $17 billion to $25 billion, 0.50% on assets under management from $25 billion to $35 billion, 0.49% on assets under management from $35 billion to $50 billion, and 0.48% on assets under management over $50 billion.  The Equity Dividend Fund has the following breakpoints:

| Equity Dividend Fund - $30.3 Billion in Net Assets | |
|---|---|
| **Breakpoint** | **Fee Rate** |
| Up to $8 billion | 0.600% |
| $8 billion to $10 billion | 0.560% |
| $10 billion to $12 billion | 0.540% |
| $12 billion to $17 billion | 0.520% |
| $17 billion to $25 billion | 0.510% |

| | |
|---|---|
| $25 billion to $35 billion | 0.500% |
| $35 billion to $50 billion | 0.490% |
| Above $50 billion | 0.480% |

30.   Defendant BRA's fee schedule is not designed for the Equity Dividend Fund and its shareholders to take advantage of the savings arising from economies of scale.  Although significant economies of scale exist for the Equity Dividend Fund, the associated cost savings largely have been appropriated for the benefit of defendant BRA rather than being shared with the Equity Dividend Fund.  For example, during the 2013 fiscal year, the Equity Dividend Fund's net assets grew from $23.1 billion to $29.9 billion.  Under the Equity Dividend Fund's current advisory fee schedule, the $6.8 billion growth of the Equity Dividend Fund's net assets will result in an additional $34.3 million in advisory fees per year for defendant BRA.  The increase in net assets during the 2013 fiscal year also triggered a lower advisory fee rate on a portion of the $6.8 billion in growth.  However, the breakpoint reductions applicable to the $6.8 billion in growth will result in less than $500,000 in per year savings for the Equity Dividend Fund.  As such, the growth in the annual advisory fees paid to defendant BRA as a result of the Equity Dividend Fund's net asset growth in the 2013 fiscal year is more than *seventy times* greater than the savings from the Equity Dividend Fund's breakpoint reductions.

31.   The investment management fees paid to defendant BRA are disproportionate to the value of services rendered, and therefore excessive, especially when considering the excess profits resulting from economies of scale.  The economies of scale enjoyed by defendant BRA with respect to the Equity Dividend Fund have not been adequately shared with the Equity Dividend Fund, as required by Section 36(b), in breach of defendant BRA's Section 36(b) fiduciary duty to the Equity Dividend Fund with respect to such compensation.

**The Costs and Profitability of Providing Investment Management Services Does Not Justify Defendant BRA's Excessive Fees**

32.     Defendant BRA's incremental costs of providing management services to the Equity Dividend Fund are not substantial, while the additional fees received by defendant BRA are unreasonable and hugely excessive given that the nature, quality, and level of the services remain the same as assets under management grow.   While fees of 0.60% or less may seem inconsequential, these percentages translate into substantial fees when applied to the Equity Dividend Fund's assets in the billions of dollars.  In fiscal year 2013 alone, defendant BRA was paid a total of over **$144 million** in investment management fees from the Equity Dividend Fund. Of that sum, defendant BRA paid the Equity Dividend Fund's sub-advisers just $106.5 million for sub-advisory services, retaining over **$37.6 million** for itself.   Accordingly, the Equity Dividend Fund has been very profitable to defendant BRA.

33.     The true cost of investment management services should correlate to the fees charged by BIM.  In fact, the fees charged by BIM to defendant BRA include BIM's costs plus, presumably, a reasonable profit.   The fact that BIM is affiliated with defendant BRA is immaterial since BIM charges other funds not affiliated with defendant BRA comparable rates for substantially the same services.  For example, in addition to being a sub-adviser for the Equity Dividend Fund, BIM also provides sub-advisory services to Valic Company I - Dividend Value Fund ("Valic Company I Fund"), a fund not affiliated with defendant BRA.  The sub-advisor fees discussed herein are negotiated at arm's-length by defendant BRA as demonstrated by the following chart in which the Equity Dividend Fund and the Valic Company I Fund share the same sub-adviser, the same investment philosophy, and nearly the same effective fee rate:

|  | BlackRock Fund | Non-BRA Advised Fund |
|---|---|---|
| Fund | Equity Dividend Fund | Valic Company I Fund |
| Sub-Advisor | BIM | BIM |
| Philosophy | "The Fund seeks to achieve its objective by investing primarily in a diversified portfolio of equity securities. Under normal circumstances, the Fund will invest at least 80% of its assets in equity securities and at least 80% of its assets in dividend paying securities. The Fund may invest in securities of companies with any market capitalization, but will generally focus on large cap securities." | "The Fund seeks to achieve its objective by investing primarily in a diversified portfolio of equity securities including common stock, preferred stock and convertible securities. Under normal circumstances, the Fund will invest at least 80% of its net assets in dividend paying equity securities. The Fund may invest in securities of companies with any market capitalization, but will generally focus on large cap securities." |
| Effective Fee Rate | 0.36% | 0.34% |

34.    Defendant BRA's markup for its investment management resulted in fees that are disproportionate to services rendered, could not be the product of negotiations conducted at arm's-length, and therefore constitutes a breach of defendant BRA's fiduciary duty to the Equity Dividend Fund with respect to the receipt of such compensation.

**The Board Was Not Acting Conscientiously in Approving Defendant BRA's Investment Management Fees**

35.    Fund trustees have a fiduciary duty to mutual funds and to their shareholders (who, individually, have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's-length.  For the reasons discussed herein, the Board was not acting consistent with its fiduciary duty when it approved defendant BRA's excessive investment management fees, and allowed these fees to continue.

36.    Each of the funds in the BlackRock funds complex is governed by a group of trustees who meet, oversee, and make decisions for all the funds in the BlackRock funds

complex.  The Board's purportedly independent members are compensated for their services.  As a result of the compensation they receive, Board membership in the BlackRock funds complex is lucrative for the fund trustees.  In 2013 alone, the trustees overseeing the funds in the BlackRock funds complex received total compensation in the following amounts:

| Director | Total Number of Portfolios Supervised | Aggregate Compensation from the BlackRock Funds (Calendar Year Ended December 31, 2013) |
| --- | --- | --- |
| James H. Bodurtha | 93 | $340,000 |
| Bruce R. Bond | 93 | $305,000 |
| Donald W. Burton | 93 | $305,000 |
| Stuart E. Eizenstat | 93 | $335,000 |
| Kenneth A. Froot | 93 | $305,000 |
| Henry Gabbay | 330 | $661,563 |
| Robert M. Hernandez | 93 | $420,000 |
| John F. O'Brien | 93 | $305,000 |
| Roberta Cooper Ramo | 93 | $305,000 |
| David H. Walsh | 93 | $340,000 |
| Fred G. Weiss | 93 | $375,000[2] |

37.     The Board has a separate and distinct fiduciary duty to each mutual fund in the BlackRock funds complex to enter into serious and substantive negotiations with respect to all fees charged by advisers, including defendant BRA.  Correspondingly, defendant BRA has a reciprocal fiduciary duty to each mutual fund under its management to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond with fees that would be charged in an arm's-length negotiation.

38.     The trustees are supposed to be "watchdogs" for the Equity Dividend Fund's shareholders.   The trustees, however, are precluded from properly monitoring the Equity Dividend Fund because they are charged with the oversight of as many as *330* investment

---

[2] The two interested trustees, Paul L. Audet and Laurence D. Fink, did not receive compensation as trustees.

portfolios in the BlackRock funds complex. Each fund has its own lengthy prospectus, regulatory filings, and compliance issues to review.

39. Furthermore, even if statutorily "non-interested," the trustees are in all practical respects dominated and unduly influenced by defendant BRA in reviewing the fees paid by the Equity Dividend Fund and its shareholders. The trustees' continuation in the role of an independent trustee from year-to-year, and the compensation they earn, is at least partially dependent on the continued goodwill and support of defendant BRA.

40. As discussed above, truly independent boards acting conscientiously would not have tolerated the investment management fees charged by defendant BRA if they had obtained adequate information regarding, among other things: (i) the services provided by the sub-advisers, and the fees the sub-advisers charged for such services, as compared to the investment management fees that defendant BRA charged for its minimal services; (ii) the economies of scale enjoyed by defendant BRA; and (iii) the profitability of the Equity Dividend Fund to defendant BRA.

41. As further evidence that the Board was not acting conscientiously when it approved defendant BRA's advisory fees for the Equity Dividend Fund, the Board approved defendant BRA's advisory fees for the Equity Dividend Fund despite the Equity Dividend Fund underperforming its primary benchmarks. In particular, the Equity Dividend Fund underperformed its primary benchmarks, the S&P 500 Index and the Russell 1000 Value Index in the one-year period and the five-year period. The following chart demonstrates the extent of the Equity Dividend Fund's underperformance:

|  | Equity Dividend Fund | S&P 500 Index | Russell 1000 Value Index |
|---|---|---|---|
| 1-Year Returns | 18.63% | 25% | 30.73% |
| 5-Year Returns | 6.85% | 8.26% | 7.88% |

42.     Accordingly, given the reasons above, the Board did not act conscientiously and therefore breached its fiduciary duty when it approved defendant BRA's investment management fees.  The Board's lack of conscientiousness resulted in fees that are disproportionate to the value of the services rendered.

## COUNT I

### Against Defendant BRA Pursuant to Section 36(b)
### Derivatively on Behalf of the Equity Dividend Fund
### (Investment Management Fees)

43.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

44.     Defendant BRA had a fiduciary duty to the Equity Dividend Fund and its investors with respect to the receipt of compensation for services and payments of a material nature made by and to defendant BRA.

45.     The fees charged by defendant BRA for providing investment management services to the Equity Dividend Fund breached defendant BRA's fiduciary duty to the Equity Dividend Fund with respect to such compensation.

46.     This Count is brought by plaintiff derivatively on behalf of the Equity Dividend Fund against defendant BRA for breach of its fiduciary duties with respect to the receipt of compensation as defined by Section 36(b).

47.     The excessive fees received by defendant BRA were in breach of its fiduciary duties to the Equity Dividend Fund with respect to such compensation.  By reason of the conduct described in this complaint, defendant BRA violated Section 36(b).

48.     As a direct, proximate, and foreseeable result of defendant BRA's breach of fiduciary duties in its role as investment adviser to the Equity Dividend Fund and its investors, the Equity Dividend Fund and its shareholders have sustained hundreds of millions of dollars in damages.

49.     In charging and receiving inappropriate, unlawful, and excessive compensation, and in failing to put the interests of plaintiff, and other shareholders of the Equity Dividend Fund ahead of its own interests, defendant BRA has breached and continues to breach its statutory fiduciary duty to the Equity Dividend Fund and its shareholders in violation of Section 36(b).

50.     Plaintiff seeks, pursuant to Section 36(b)(3), the actual damages resulting from the breach of fiduciary duty by defendant BRA, up to and including, the amount of compensation or payments received from the Equity Dividend Fund and earnings that would have accrued to the Equity Dividend Fund's shareholders had that compensation not been paid.

51.     Alternatively, plaintiff seeks rescission of the contracts and restitution of all the excessive fees paid pursuant thereto. *See* ICA section 47(b), 15 U.S.C. §80a-46(a-b).  When a violation of the ICA has occurred, a court may order that the IMA between defendant BRA and the Equity Dividend Fund, on behalf of the Equity Dividend Fund, be rescinded, thereby requiring restitution of all investment management fees paid to it by the Equity Dividend Fund from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      An order declaring that defendant BRA has violated and continues to violate Section 36(b) through the receipt of fees from the Equity Dividend Fund that breach defendant BRA's fiduciary duty with respect to the receipt of compensation.

B.      An order preliminarily and permanently enjoining defendant BRA from further violations of the ICA.

C.      An order awarding compensatory damages on behalf of the Equity Dividend Fund against defendant BRA, including repayment of all unlawful and/or excessive investment management fees paid to it by the Equity Dividend Fund or its shareholders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.  Plaintiff reserves the right to seek punitive damages where applicable.

D.      An order rescinding the IMA between defendant BRA and the Equity Dividend Fund, including restitution of the excessive investment management fees paid to defendant BRA by the Equity Dividend Fund from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

E.      Such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 3, 2014

WOLLMUTH MAHER & DEUTSCH LLP

David H. Wollmuth (DW-9618)
dwollmuth@wmd-law.com
Frederick R. Kessler (FK-8168)
fkessler@wmd-law.com
One Gateway Center
Newark, NJ 07102
(973) 733-9200

Attorneys for Plaintiff

Of Counsel:

ROBBINS ARROYO LLP
Brian J. Robbins
Stephen J. Oddo
Edward B. Gerard
Justin D. Rieger
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com

943478

## VERIFICATION

I, Amy Fox, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 31 March 2014

AMY FOX